UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KENNETH W. EDGEMON,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

    Defendant.

CASE NO.   C06-5619KLS

ORDER AFFIRMING THE COMMISSIONER'S DECISION TO DENY BENEFITS

    Plaintiff, Kenneth W. Edgemon, has brought this matter for judicial review of the denial of his application for disability insurance benefits. The parties have consented to have this matter be heard by the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and Local Magistrates Rule 13. After reviewing the parties' briefs and the remaining record, the undersigned hereby finds and ORDERS as follows:

## FACTUAL AND PROCEDURAL HISTORY

    Plaintiff currently is fifty-three years old.[1] Tr. 56. He has an eleventh grade education, has taken two pipe fitting college courses in mechanical math and pattern drawings, and has past work experience as a paper maker and pipe fitter. Tr. 20, 26-27, 98, 104.

    On May 11, 2005, plaintiff filed an application for disability insurance benefits, alleging disability as

---

[1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

ORDER
Page - 1

of November 29, 2004, due to two herniated discs and arthritis in the right side of his neck, extreme pain and severe headaches. Tr. 13, 85, 97. His application was denied initially and on reconsideration. Tr. 56-58, 64. A hearing was held before an administrative law judge ("ALJ") on February 17, 2006, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 23-55.

On April 11, 2006, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

    (1)    at step one of the disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity at any time during the relevant time period;

    (2)    at step two, plaintiff had "severe" impairments consisting of cervical degenerative disc disease and an adjustment disorder;

    (3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

    (4)    at step four, plaintiff had the residual functional capacity to perform a modified range of light work, which precluded him from performing his past relevant work; and

    (5)    at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 15-16, 20-21. Plaintiff's request for review was denied by the Appeals Council on September 1, 2006, making the ALJ's decision the Commissioner's final decision. Tr. 3; 20 C.F.R. § 404.981.

On October 25, 2006, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1). Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits for the following reasons:

    (a)    the ALJ erred in evaluating the opinions of his treating physicians;

    (b)    the ALJ erred in assessing plaintiff's credibility; and

    (c)    the ALJ erred in evaluating the lay witness evidence in the record.

For the reasons set forth below, however, the undersigned does not agree that the ALJ erred in determining plaintiff to be not disabled, and therefore affirms the ALJ's decision.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the

---

[2] The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

ORDER
Page - 2

1  Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to
2  support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is
3  such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson
4  v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than
5  a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir.
6  1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than
7  one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d
8  577, 579 (9th Cir. 1984).
9  I.	The ALJ Properly Evaluated the Opinions of Plaintiff's Treating Physicians
10 	The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the
11 medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the
12 record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the
13 ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must
14 be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir.
15 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact
16 inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts
17 "falls within this responsibility." Id. at 603.
18 	In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be
19 supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a
20 detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation
21 thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence."
22 Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the
23 ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).
24 	The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of
25 either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a
26 treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and
27 legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the
28 ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739

F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir., 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

The record contains progress notes and opinions from two physicians who have treated plaintiff, Michael P. Carroll, M.D., and James E. Ostrander, M.D. With respect to the opinions and other medical evidence provided by these two physicians, the ALJ found in relevant part as follows:

> Dr. Carroll opined on December 20, 2004, that the claimant should avoid lifting burdens weighing more than twenty pounds, and avoid reaching overhead. He further opined that the claimant would be unable to return to his old job, because of chronic narcotic pain medications (Exhibit 1F: 6). On May 9, 2005, Dr. Carroll completed a "physician's report of disability" in which he stated that he does not do long-term disability evaluations, but opined the claimant "[was] not qualified for any full time occupation and would be considered disabled for any occupation therefore". He added that the claimant had been in this condition since November 29, 2004 (Exhibit 4F). Dr. Ostrander wrote in an interoffice memorandum dated May 19, 2005, that he had reviewed the claimant's application for medical disability retirement and opined that he would be disabled due to "severe degenerative changes in the neck and shoulder with significant chronic pain syndrome" (Exhibit 5F: 4). On October 11, 2005, Dr. Ostrander performed a physical capacity evaluation, opining the claimant could lift and carry twenty pounds occasionally and ten pounds frequently. He further opined that during an eight-hour day, the claimant could sit for one hour at a time for up to three hours and stand or walk for thirty minutes at a time for up to one hour. Furthermore, Dr. Ostrander opined the claimant should not climb, reach overhead or engage in pushing or pulling and was limited to only occasional bending squatting or crawling. Finally, he opined the claimant should avoid all exposure to extreme temperatures, humidity or hazardous conditions. Dr. Ostrander checked off on the form indicating that in his opinion, the claimant was likely to miss four or more days of work per month (Exhibit 5F: 1-3).
>
> Social Security Ruling ["SSR"] 96-2p requires that if a treating medical source opinion is well supported by medically acceptable clinical and/or laboratory diagnostic studies, and is "not inconsistent" with other substantial evidence in the case record, it must be

> given controlling weight, i.e., it must be adopted.  As treating sources, the opinions of Dr. Carroll and Dr. Ostrander deserve serious consideration, because they have personally examined the claimant and have followed the course of the claimant's medical condition over a period of time.  However, they rendered their opinions absent the objective clinical evidence necessary to substantiate and explain how the claimant's condition had so quickly and severely deteriorated such that in a matter of months he went from working – despite his pain and with no medications – for 60 to 70 hours per week, to being unable to work at all.
>
> Arguably, while the doctors stated that the claimant is 'disabled', it is not clear that they intended to use this term consistent with the definition of 'disability' contained in the Social Security Act and Regulations.  Specifically, it is possible that they were merely documenting the claimant's eligibility for medical retirement benefits from his employer.  Even though they described physical limitations on the part of the claimant, the crux of their conclusion that the claimant was disabled was because he was on chronic narcotic pain medication which would keep him from work with his employer and entitle him to "disability".
>
> In any event, these opinions are inconsistent with other substantial evidence in the case record.  Dr. Carroll himself opined in December 20, 2004, after the alleged date [sic] onset date, that the claimant was capable of performing limited light exertional level work.  His clinical notes from that day reveal that he had found the claimant to have normal range of motion in his neck and normal strength in his arms.  Furthermore, an MRI study performed on November 30, 2004, apparently showed medical improvement when compared to an earlier one performed in June 2001.  Dr. Carroll further noted that surgery was not indicated and recommended the claimant retire (Exhibit 1F: 17).
>
> Consequently, the undersigned concludes that the opinions of Dr. Carroll and Dr. Ostrander can be afforded little weight.

Tr. 17-18 (internal footnote omitted).

Plaintiff first takes issue with the ALJ's finding that Drs. Carroll and Ostrander did not substantiate their opinions with objective clinical evidence sufficient to explain how his condition had deteriorated in such a short period of time, causing him to go from "working – despite his pain and with no medication – for 60 to 70 hours per week, to being unable to work at all." Tr. 18.  He argues that in such a circumstance, the ALJ had a duty, pursuant to 20 C.F.R. 404.1512(e), to obtain additional evidence or clarification from Drs. Carroll and Ostrander.  That regulation, however, imposes this requirement only when the claimant's medical opinion source evidence is inadequate to determine <u>whether</u> he or she is disabled, and even then only in certain circumstances.[3]  <u>Id.</u>  That is not the case here because, as explained below, the ALJ had an

---

[3] Section 404.1512(e) reads in relevant part: "When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision." Section 404.1512(e)(1) does further state that: "We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." This subpart only comes into play though once it is determined that the medical evidence in the record is inadequate to determine if the claimant is disabled, that is, if, based on the medical evidence from the claimant's

adequate basis on which to determine that plaintiff was not disabled, due to the lack of objective medical evidence establishing the existence of disabling impairments and limitations.

Plaintiff next argues the medical evidence in the record shows his symptoms worsened during the years 2003 to 2005. The undersigned disagrees. It is true that in late April 2003, Dr. Ostrander found "left-sided tightness" and "decreased range of motion" in plaintiff's paracervical region," and that he diagnosed him with "[s]pasm." Tr. 270. However, while plaintiff had decreased flexion, extension and rotation "to the left" in early July 2003, his deep tendon reflexes were intact and muscle strength in his upper extremities was "good". Tr. 269. Indeed, Dr. Ostrander released him to modified work in mid-July 2003. Id. By early September 2003, furthermore, plaintiff was experiencing "decreased stiffness," with "no spinous tenderness" or "radiculopathy". Tr. 268. Dr. Ostrander diagnosed him with "improved" lumbar strain and released him to regular work. Tr. 268-69.

There is little in the way of diagnostic or treatment notes from Dr. Ostrander for the year 2004. For example, in late January 2004, he diagnosed plaintiff with a right wrist strain and with neck pain in late August 2004, but found no functional restrictions or work-related limitations. Tr. 266, 269. Dr. Ostrander did note that plaintiff was being placed on "time loss" from his job effective November 29, 2004, but the only mention of actual clinical findings for visits occurring in late 2004 and early 2005, were assessments of neck, back and shoulder pain, and "[c]hronic pain syndrome with degenerative changes." Tr. 264-65. Again, no objective functional or work-related limitations were opined. Dr. Ostrander filled out a physcial capacities evaluation form in late September 2005, but, with the exception of the number of days likely to be missed per month, he indicated an ability to perform in the light work range. Tr. 257-58.

Dr. Carroll's treatment notes for the same time period are equally uninformative, and, once more, fail to show the onset of significantly worsening symptoms. In late March 2003, Dr. Carroll diagnosed plaintiff with chronic neck pain, noting only that his neck muscles were "stiff and sore" on the left, with "no numbness" in his left arm or hand. Tr. 186-87. He merely told plaintiff that he had "some" muscle tightness

---

medical source or sources, the ALJ cannot make a disability determination. In other words, if the ALJ is able to find that the medical evidence in the record shows the claimant is or is not disabled, he or she need not re-contact the claimant's medical sources.

Plaintiff also points to SSR 85-16, 1985 WL 56855, to support his argument that the ALJ was required to obtain additional information from his treating physicians. That Social Security Ruling, however, specifically was promulgated to "state the policy and describe the issues to be considered when an individual with a mental impairment requires a residual functional capacity (RFC) in order to determine the individual's capacity to engage in basic work-related activities." Id. at *1. Because plaintiff is not claiming disability based on such an impairment here, SSR 85-16 therefore is inapplicable.

ORDER
Page - 6

and spasm that "some massage and time," as well as smoking cessation, should help improve. Tr. 187. In early July 2003, Dr. Carroll again diagnosed plaintiff with chronic neck pain, noting that he was "[s]till doing his job and not complaining of weakness or tenderness." Tr. 185.

The same diagnosis once more was provided in late April 2004, but with no more recent objective clinical findings. Tr. 184. Indeed, Dr. Carroll's notes for the entire year of 2004, and, indeed, well into the early part of 2005, provide little in the way of such findings except for in late December 2004, when he quoted a prior Washington State Department of Labor and Industries ("L&I") evaluation finding normal neck range of motion and normal arm strength. Tr. 160-61. That same evaluation also posited no overhead work or lifting greater than 20 pounds limitations, which are consistent with a modified range of light work restriction. Tr. 161. Plaintiff points to a number of statements and complaints he made regarding increasing pain and inadequate pain control, but, as noted above, those complaints are not supported by the objective medical evidence. In addition, as explained below, the ALJ properly discounted plaintiff's credibility. See Tonapetyan, 242 F.3d at 1149 (ALJ may disregard medical opinion premised on claimant's complaints where record supports ALJ in discounting claimant's credibility).

Plaintiff further argues the ALJ incorrectly found he was not taking medication while working at the rate of 60 to 70 hours per week during much of 2004. See Tr. 17-18. The evidence in the record that plaintiff points to in support of this argument, however, does not necessarily show that he actually was taking medication while working during that time period, though he may have been taking it at other times. See Tr. 184, 186-88. Plaintiff also points to his testimony at the hearing, wherein he states he did, and was allowed to, take a Tylenol-based medication while at work. See Tr. 31. As note above, the ALJ properly discounted plaintiff's credibility. Even if this evidence could be said to prove the point plaintiff is trying to make though, i.e., that he did take some medication while at work, it hardly disprove's the ALJ's finding that there is little to no objective medical evidence in the record to support the disability opinions rendered by his treating physicians.

Plaintiff asserts in addition that he was working with assistance while at work, but, again, other than his own testimony on this issue, points to no evidence in the record that this was so. Plaintiff also relies on a statement provided by his former supervisor that as his condition progressed, he asked for help more frequently. In that statement, however, plaintiff's supervisor related that his requests for help were made primarily in conjunction with the need to perform "significant lifting, grinding or other arm or back intensive

ORDER
Page - 7

work." Tr. 151.  While this may certainly be indicative of work-related limitations, it does not demonstrate an inability to perform light category type of work,[4] let alone prove disability, or, again, make up for the dearth of objective clinical findings in the record.

Plaintiff further points to his own testimony that he rested much of the time while at work because there was no supervision other than his boss, but that same supervisor noted that there were times when the two of them "would work together for several hours at a time." Tr. 151.  Once more, as the ALJ properly discounted plaintiff's credibility, he was not required to believe his testimony, particularly in light of the supervisor's statement just noted.  As previously discussed, furthermore, plaintiff's testimony cannot make up for the lack of absence of supporting medical evidence.  Plaintiff also argues it is unfair for the ALJ to require his treating physicians to explain how he was able to go from working with pain to no longer being able to tolerate it.  The point is, however, that neither physician appropriately supported their opinions that he was incapable of doing any work.  It is not unreasonable for the ALJ to require such support.  Indeed, as noted above, the Ninth Circuit is in agreement on this point.

Plaintiff disagrees too with the ALJ's statement that it was not clear his treating physicians intended to use the term "disability" as defined by the Social Security Act and Regulations.  Plaintiff notes that Dr. Carroll found him totally and permanently disabled from any occupation, and that Dr. Ostrander concurred with that opinion. <u>See</u> Tr. 175-77, 258-59, 280-81.  The evidence in the record on this issue, however, is not nearly as clear as plaintiff makes it out to be.  For example, on December 20, 2004, Dr. Carroll stated specifically in relevant part in a "clinician's report of disability" that:

> #1
> I do not do disability evaluations but the patient did request I write this note. [sic] and I received a note from the company that I must say the employee is totally and permanently disabled from any occupation . . .
> He is on chronic narcotics and [sic] patient tells me this is not allowed while working at [sic] company so he would be disabled frrom [sic] any occupation at the company if this is correct as its [sic] not likely he would stop taking the narcotics in the future.
> #2
> date disability started would be 11/29/04
> #3
> . . . he is on chronic narcotics for chronic pain and its [sic] not expected to get better.

Tr. 176-77.  Prior thereto, Dr. Carroll also had noted that plaintiff had been "off work" since November 29,

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

2004, by Dr. Ostrander, because he was "on narcotics" and could not use them at work. Tr. 176. Plaintiff apparently showed Dr. Ostrander this note that same day. See Tr. 264.

In late April 2005, Dr. Ostrander noted that plaintiff continued to be on narcotic pain medications, and had been found "not qualified for any jobs" at his company, but that "the doctor needs to state in his letter any occupation." Id. On May 9, 2005, Dr. Carroll issued another "clinician's report of disability," opining as follows:

> I do not do long term disability evaluations but in my opinion, He [sic] is not qualified for any full time occupation and would be considered disabled for any occupation therefore [sic]. The date this began would be when he first went off work on 11/29/04. It is not expected that he will get any better in the future as this is [sic] long term chronic problem.

Tr. 175; see also Tr. 280-81. On May 16, 2005, plaintiff again appears to have showed Dr. Carroll's note to Dr. Ostrander, who stated plaintiff was "probably a medical retirement" and sent him "over to submit his letter to [sic] medical retirement section." Tr. 264. Three days later, Dr. Ostrander opined in relevant part in a letter addressed to plaintiff's employer that:

> Mr. Edgemon suffers from severe degenerative changes in the neck and shoulder with significant chronic pain syndrome. He has been deemed totally and permanently disabled from any occupation by Dr. Carroll, and I have discussed the case with Dr. Carroll on the phone.
>
> Mr. Edgemon should be found totally and permanently disabled effective November 29, 2004. Dr. Carroll has substantiated his disability due to chronic high-dose narcotic pain control medications and degenerative changes.

Tr. 260.

Thus, while Dr. Carroll did state in late December 2004, that plaintiff was totally and permanently disabled from any occupation, it appears he did so in large part because plaintiff's employer told him that he must do so. In addition, contrary to plaintiff's assertion, it does seem that Dr. Carroll based his opinion of disability primarily on the fact that he was continuing to take narcotic pain medication, which was not allowed by his employer. Dr. Carroll did not expressly state this in his May 9, 2005 opinion. That opinion did reference the November 29, 2004 disability onset date, however, which in his previous report he stated was the effective date of plaintiff's being off work due to his use of narcotic pain medication and his employer's prohibiting of such. Finally, Dr. Ostrander himself reiterated that his opinion of disability was based on that of Dr. Carroll, who "substantiated" plaintiff's disability due largely to his "chronic high-dose narcotic pain control medications." Id.

ORDER
Page - 9

1    The fact that Dr. Carroll and Dr. Ostrander found plaintiff to be disabled for the most part based on
2 his use of narcotic pain medications is important here because, as the ALJ noted:

> The terms of the claimant's employer's retirement plan provided for medical retirement benefits if certain employees were unable to continue working there due to a disability. Because it is contrary to company policy for an employee to work while using narcotic pain medications, and because the claimant needed these medications in order to function, he was 'disabled' under the conditions of the company's plan.

Tr. 18 (footnote 2). This showing of disability, however, is not at all the same as what is needed to prove disability in order to receive benefits under the Social Security Act. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant must show impairment renders him or her incapable both of performing his or her past work and any other substantial gainful employment that exists in national economy) (citing 42 U.S.C. § 423(d)(2)(A)).

Plaintiff emphasizes the fact that Dr. Ostrander provided a "detailed" physical capacities evaluation of his functional limitations as well. As noted above, however, that evaluation form indicated plaintiff was capable essentially of performing a modified range of light work largely consistent with the ALJ's findings concerning his residual functional capacity. See Tr. 16, 257-58. While Dr. Ostrander indicated as well on that form that plaintiff likely would miss more than four days of work per month (see Tr. 258), as with his mid-May 2005 opinion that plaintiff was totally and permanently disabled, he provided little, if anything, in the way of clinical findings to support that checked box. Indeed, he appears to have based this finding on both his own records, which, again, lack much in the way of objective findings, and Dr. Carroll's disability opinion, which also, as discussed above, lacks sufficient evidentiary support.

Plaintiff also raises certain additional objections to the ALJ's findings concerning the disability opinions provided by Dr. Carroll. First, he challenges the ALJ's finding that Dr. Carroll opined he was capable of performing light work. Plaintiff asserts Dr. Carroll never actually gave that opinion, but instead merely was quoting from a prior L&I evaluation. While this does appear to be the case as discussed above (see Tr. 161), the undersigned does not find it necessarily improper for the ALJ to have assumed that this was Dr. Carroll's opinion too, as he certainly did incorporate it into his treatment notes.

In addition, contrary to plaintiff's contention, it is entirely logical to assume Dr. Carroll agreed with the L&I evaluation since he did include it in his own notes, and did not state he disagreed with the findings contained therein. See Tr. 160-61. The MRI Dr. Carroll ordered, furthermore, was merely to comply with

ORDER
Page - 10

the evaluation's recommendations, not to contradict it. See id.  For the same reasons discussed above, plaintiff's argument that the ALJ erred in attributing the normal neck range of motion and arm strength findings to Dr. Carroll is without merit as well. See Tr. 161.  Further, no prior or contemporaneous treatment notes in the record provided by Dr. Carroll contain any contrary objective clinical findings. See Tr. 158-59, 161, 184-88, 191-92, 221-22, 232, 224, 244-45.

Lastly, plaintiff asserts the ALJ's statement that Dr. Carroll's disability opinions were inconsistent with his late December 2004 normal range of motion and normal arm strength findings and with an MRI performed in late November 2004, which showed medical improvement compared to an earlier MRI. See Tr. 18, 161, 166, 226-27.  Plaintiff argues the latter MRI in fact showed progression of degenerative joint disease at one facet of his cervical spine.  It is true the MRI report showed a possibly "slightly more increased" neural forminal narrowing at C3-4. Tr. 166.  The remainder of the MRI, however, demonstrated definite improvement in plaintiff's neural forminal narrowing at other facets of his cervical spine.  Thus, overall, the ALJ was correct in finding the latter MRI showed improvement.

In addition, the undersigned notes the record contains other medical source opinion evidence which is inconsistent with the disability opinions provided by Drs. Carroll and Ostrander.  A physical residual functional capacity form completed in early July 2005, and affirmed by Robert G. Hoskins, M.D., in early August 2005, found plaintiff to have limitations placing him in the modified range of light work category. See Tr. 246-53.  While Dr. Hoskins is a non-examining consulting physician, his opinion is consistent with the clinical findings and work-related limitations that were found by Dr. Carroll and Dr. Ostrander and the L&I evaluation noted above.  Thus, because Dr. Hoskins' opinions is "consistent with other independent evidence in the record," it may be treated as substantial evidence. Lester, 81 F.3d at 830-31; Tonapetyan, 242 F.3d at 1149.  Accordingly, the ALJ did not err in affording little weight to the disability opinions of plaintiff's treating physicians.

II.    The ALJ Did Not Err in Assessing Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579.  That some of the reasons for discrediting a

claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

Here, the ALJ gave several reasons for discounting plaintiff's credibility. For example, the ALJ noted that while plaintiff testified at the hearing that he could not even hold a bowl of cereal with his left arm, he was noted by Dr. Carroll to have full range of motion in his neck and normal arm strength in late December 2004. Tr. 17. Although these clinical findings appear to originally have been made during an L&I evaluation, as discussed above, it was reasonable for the ALJ to have assumed Dr. Carroll agreed with those findings by including them in his own treatment notes. See Tr. 160-61. Also as noted by the ALJ, furthermore, Dr. Ostrander found plaintiff to be capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently as well in late September 2005. Tr. 17, 257.

A determination that a claimant's complaints are "inconsistent with clinical observations", such as the ALJ's here, can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998). However, a claimant's pain testimony may not be rejected "solely because the degree of pain alleged is not supported by objective medical evidence." Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir. 1995) (quoting Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir.1991) (en banc))

(emphasis added); see also Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir.2001); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989).  In this case though, the ALJ did provide other clear and convincing reasons for discounting plaintiff's credibility.

The ALJ discounted plaintiff's credibility in part for the following reason:

> The claimant has also described in writing and testimony daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.  For example, he cleans the house, does laundry and shops occasionally.  He uses a computer daily, and rides a mortcycle up to 30 miles two to three times a month.  At the hearing he testified that he occasionally drives three hours one way to visit his in-laws.

Tr. 17.  To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.  The undersigned finds the ALJ properly relied on those activities here.

Plaintiff argues that the activities the ALJ noted were limited, and that the ALJ failed to take into account the restrictions he indicated he had with those activities.  It is true plaintiff stated that he spent each day focusing on only one to two chores and that had to take "long and frequent breaks" when doing them.  Tr. 121; see also 127.  On the other hand, plaintiff also stated that he did all of the inside household chores, and that he spent four to six hours each day working on them. Tr. 121.  While this does create some ambiguity in the record as to the nature and extent of plaintiff's ability to engage in these activities, the undersigned notes that the ALJ's credibility determination may not be reversed where that determination is based on contradictory or ambiguous evidence. See Allen, 749 F.2d at 579.

In addition, as noted above, the ALJ pointed out that plaintiff reported being able to work on the computer and go on 30-mile motorcycle rides, and testified that he occasionally drove three hours one way to visit his in-laws.  Although reliance on plaintiff's ability to work on the computer is questionable, as he reported being able to do so for only one-half to one hour at a time – though he did not indicate how long in between he needed to rest before going back on the computer – certainly the ability to go on a 30-mile motorcycle ride, as well as drive one way in a car for three hours at a time, may be indicative of less than disabling pain. See Tr. 123.  While plaintiff reported he went on such rides only two to three times each

month, he did not state this limit was due to any physical limitations.

Finally, the ALJ gave the following reason for discounting plaintiff's credibility:

> [T]he claimant admits that in 2004 he had been working 60 to 70 hours per week for a good part of the year which made 2004 his highest earning year of his working career. Moreover, while on the job he was not permitted to use narcotic pain medications. Because there is no evidence of a significant deterioration in the claimant's medical condition that would explain the sudden increase in pain that forced him to quit working, it is reasonable to infer that either the claimant's impairments would not prevent the performance of that job – since it was being performed adequately despite a similar medical condition – or that working well in excess of a normal full-time workload explains his increased pain.

Tr. 17. The undersigned finds this reason too to be clear and convincing. As discussed above, the ALJ did not err in discounting the disability opinions provided by Dr. Carroll and Dr. Ostrander due to little to no objective medical evidence in the record to explain why plaintiff could no longer perform his prior work because of disabling pain. Nor, also as explained herein, is plaintiff's testimony that he spent much of his time at work resting out of sight fully supported by the record, as the supervisor himself stated they "would work together for several hours at a time" on occasion. Tr. 151. Thus, the undersigned cannot fault the ALJ for taking this factor into account as well.

### III. The ALJ Properly Discounted the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001). An ALJ may discount lay testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984) (finding it proper for ALJ to discount lay testimony that conflicts with available medical evidence). In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

Here, the ALJ evaluated the lay witness evidence in the record as follows:

> The undersigned has also considered the statements of the claimant's witnesses. There is no reason to doubt their observations of the behaviors the claimant demonstrates, and the undersigned finds them to be generally credible. However, as they do not have medical and/or vocational expertise, their opinions are of limited value in establishing the claimant's residual functional capacity, or determining how the claimant's impairments affect his overall ability to perform basic work activities. Moreover, none of their

      observations suggest the claimant has limitations greater than those determined in this decision. A number of the comments make [sic] by his wife and friends and relatives in the "E" section of the file reflect on the claimant's deteriorating condition and poor mood over the last year of his work. These comments, however, do not mention the fact that the claimant was working 60-70 hours a week including Saturdays for much of the year. If his mood had changed or his fatigue increased, certainly this is [sic] level of work may well account for the change. At a minimum, the increased work must be acknowledged. Additionally, there are inconsistencies between the claimant's testimony concerning his work and that of his supervisor at 12E. Moreover, even the claimant's testimony of his work is inconsistent. At times, the claimant testified that he was a hard working employee who worked consistently doing heavy work with wrenches and pipe. Yet at times he indicated he actually did little at work because he was able to rest and lay down most of the day. His supervisor indicates he had some limits with weights and heavy lifting and did ask for help at times. He said nothing about the need to lay or rest during a workday as the claimant alleges.

Tr. 19.

      Plaintiff first argues the ALJ erred in stating that because the lay witnesses in the record have no medical or vocational expertise, their opinions were of limited value in establishing his residual functional capacity or determining how his impairments affect his overall ability to perform basic work activities. The undersigned agrees this is not a valid reason to discount their statements. The Commissioner's own regulations, for example, require the ALJ to consider "observations by non-medical sources as to how an impairment affects a claimant's ability to work." <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing 20 C.F.R. § 404.1513(e)(2)). Further, "[d]escriptions by friends and family members in a position to observe a claimant's symptoms and daily activities have routinely been treated as competent evidence." <u>Id.</u> Thus, the ALJ cannot discount such lay witness evidence for this reason.

      The undersigned does find, however, that the ALJ provided other legitimate reasons for discounting the lay witness statements in the record. Plaintiff asserts the ALJ also was incorrect in stating that none of their observations suggest he had limitations greater than those the ALJ found. For example, plaintiff notes his wife reported that he stayed close to home so that he could lay down or get comfortable. But the fact that plaintiff may tend to stay close to home for this reason is not necessarily incompatible with an ability to perform a modified range of light work while on the job. Plaintiff further points to his wife's report that he nods off due to a lack of sleep when talking to her. Again, though, this observation does not in itself show that plaintiff is more limited in a work setting than found by the ALJ. The same is true with respect to the other witnesses' statements regarding his sleeping difficulties and fatigue.

      Plaintiff next argues his step daughter reported that he is unable to take family trips or vacations,

because he cannot travel long distances, as he is not capable of sitting for long periods of time. However, as noted above, plaintiff himself reported that he took 30-mile trips on his motorcycle up to two to three times per month, and that he was able to drive for three hours straight to visit his in-laws. In addition, also as discussed above, the medical evidence in the record indicates plaintiff can sit for up to six hours in an eight-hour workday as found by the ALJ in his assessing plaintiff's residual functional capacity. See Tr. 16. As such, the ALJ was not obligated to adopt sitting limitations greater than he did.

Plaintiff further argues the ALJ erred in attributing the lay witnesses' statements regarding his irritability and fatigue to his long work hours. Specifically, plaintiff asserts that all of their statements were made well over a year after he stopped working. The statement submitted by Roger D. Vincent, however, one of plaintiff's former co-workers, solely concerns the period of time during which they worked together. See Tr. 149. The same is true with respect to the statement provided by Gary Pegg, plaintiff's former work supervisor. See Tr. 151. In addition, while plaintiff's step daughter did not work with him, her statement specifically concerned both the present and "the past several years" while she "still lived at home." Tr. 153. Although it is true, as plaintiff asserts, that none of the lay witnesses attributed his irritability or fatigue to his work, at least with respect to these three witnesses whose statements do cover that period time, it was entirely reasonable for the ALJ to take their lack of mention of his work hours into account.

Lastly, plaintiff argues the ALJ erred in finding inconsistencies between the statement of plaintiff's supervisor and his own testimony concerning his work. Plaintiff asserts that there is no inconsistency, as it did not appear his supervisor had knowledge of the fact that he lay down or rested the workday. However, while certainly plaintiff's supervisor may not have been watching him all of the time, he did report that he had the opportunity to observe plaintiff perform his job "several times a week," and, at least on occasion, the two of them "would work together for several hours at a time." Tr. 151. This implies that to the extent plaintiff did lay down and rest on the job, he was not doing so nearly as much as he made it out to be. His supervisor's detailed statement concerning his abilities and limitations further indicates that he was fairly well acquainted with his performance while on the job.

Indeed, as the ALJ additionally notes, even plaintiff's own testimony regarding his work was not consistent, testifying at times that he was "a hard working employee who worked consistently doing heavy work with wrenches and pipe," and at other times indicating he "actually did little work because he was able

to rest and lay down most of the day." Tr. 19. Thus, not only does this further highlight the fact that plaintiff's testimony is inconsistent with the statements of his supervisor, but it is yet another legitimate reason for discounting plaintiff's own credibility. See Smolen, 80 F.3d at 1284 (ALJ may consider ordinary techniques of credibility evaluation such as prior inconsistent statements). As such, the undersigned finds the ALJ provided germane reasons for discounting the lay witness statements in the record.

## CONCLUSION

Based on the foregoing discussion, the Court finds the ALJ properly determined plaintiff was not disabled. Accordingly, the ALJ's decision hereby is AFFIRMED.

DATED this 29th day of June, 2007.

/s/ Karen L. Strombom
Karen L. Strombom
United States Magistrate Judge